IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - x
                             :
UNITED STATES OF AMERICA     :
                             :
     vs.                     :   Criminal No. 05-0235
                             :
CARLOS MARIO JIMENEZ-NARANJO :
                             :
        Defendant            :
                             :   Washington, D.C.
- - - - - - - - - - - - - - x   May 12, 2008
```

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE ALAN KAY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:       GLENN ALEXANDER, ESQ.
                          Assistant United States Attorney

For the Defendant:        GREGORY SPENCER, ESQ.
                          RICHARD DIAZ, ESQ.
                          DONNA NEWMAN, ESQ.

Interpreter:              TERESA SALAZAR

**Proceedings recorded by the Court, transcript produced by Pro-Typists, Inc., 1012-14th Street, N.W., Suite 307, Washington, D.C.  20005, 202-347-5395**
M2497/bf

1                 **P R O C E E D I N G S**

2          THE CLERK:  Criminal Case Number 2005-235, the

3 United States of America versus Carlos Mario Jimenez-

4 Naranjo.  Glenn Alexander representing the Government;

5 Gregory Spencer, Richard Diaz and Donna Newman

6 representing the Defendant.  The Interpreter is Teresa

7 Salazar.  The Defendant is present in the courtroom.

8 This is set down for a detention hearing.

9          THE MAGISTRATE JUDGE: Mr. Alexander?

10          MR. ALEXANDER:  Your Honor.

11          THE MAGISTRATE JUDGE:  Well, before I get to

12 you, Mr. Alexander, I understand Mr. Diaz is now

13 representing Mr. Jimenez-Naranjo?  Is that correct,

14 Mr. Spencer?

15          MR. SPENCER:  That's correct, Your Honor.

16 Both Mr. Richard Diaz and Ms. Donna Newman have been at

17 appearances to represent Mr. Naranjo.  Also, Your Honor,

18 with the Court's permission, both Mr. Diaz and Ms. Newman

19 wish me to move their admittance to this bar, pro hac

20 vice, with the Court's permission.

21          THE MAGISTRATE JUDGE:  And you attest to the

22 standing before a --

23          MR. SPENCER:  Yes, Your Honor.

24          THE MAGISTRATE JUDGE:  -- highest court of

25 another jurisdiction?

 1          MR. SPENCER:  Yes, Your Honor.  With respect to

 2   Mr. Diaz, he actually has a written motion for admittance

 3   pro hac vice that was filed, but as reiterated in that

 4   motion, Mr. Diaz is a member of good standing in many

 5   federal district courts, including the Southern District

 6   of Florida, Southern District of Texas, Northern District

 7   of Georgia, and courts -- he's admitted to practice in

 8   courts in New York, New Jersey, Mississippi, and many

 9   other states.

10          Your Honor, he's a member in good standing of

11   principally the Florida bar, and I would move his

12   admission under Local Rule 83.2-3 for admission to the

13   United States District Court for the District of Columbia

14   to represent Mr. Naranjo.

15          THE MAGISTRATE JUDGE:  And Ms. Newman also?

16          MR. SPENCER:  Your Honor, yes, Your Honor.  With

17   respect to Ms. Newman, Ms. Newman is a member of good

18   standing of both the New York and New Jersey bars.  She's

19   a member of good standing and practice in the federal

20   courts in both of those jurisdictions, in addition to the

21   Federal District Court in the District of Connecticut.

22   She is a member of good standing in bars, with no actions

23   against her, and I would move her admission also, under

24   Local Rule 83.2(d), to represent Mr. Naranjo before the

25   United States District Court for the District of Columbia.

| | |
|---|---|
| 1 | THE MAGISTRATE JUDGE:  All right.  Thank you, |
| 2 | Mr. Spencer.  The Court will grant your motion and will |
| 3 | admit both Mr. Diaz and Ms. Newman, pro hac vice, with |
| 4 | respect to their representation of Mr. Naranjo in this |
| 5 | particular case.  And welcome, both Ms. Newman and |
| 6 | Mr. Diaz. |
| 7 | MS. NEWMAN:  Thank you, Your Honor. |
| 8 | MR. SPENCER:  And with that, Your Honor, I |
| 9 | request that the Federal Public Defender for the District |
| 10 | of Columbia be withdrawn. |
| 11 | THE MAGISTRATE JUDGE:  I will release you from |
| 12 | any further responsibility in this case, Mr. Spencer. |
| 13 | Thank you, sir. |
| 14 | MR. SPENCER:  Thank you, Your Honor. |
| 15 | THE MAGISTRATE JUDGE:  Now, Mr. Alexander. |
| 16 | MR. ALEXANDER:  Thank you, Your Honor.  Your |
| 17 | Honor, the Government has filed a motion for pretrial |
| 18 | detention in this case.  If Your Honor's had a chance to |
| 19 | see that? |
| 20 | THE MAGISTRATE JUDGE:  Yes. |
| 21 | MR. ALEXANDER:  The Government would proceed by |
| 22 | proffer in its motion for pretrial detention.  Your Honor, |
| 23 | the Defendant is charged with two offenses that, under |
| 24 | 18 U.S.C. 3142, are narcotics offenses that create a |
| 25 | rebuttable presumption because both of them carry a |

1  maximum penalty of at least 10 years, a rebuttable

2  presumption that no condition or combination of conditions

3  will reasonably assure the Defendant's appearance at

4  trial, and the safety of the community.

5        This Defendant, Your Honor, is one of the

6  leaders or was one of the leaders of what was formerly

7  called the AUC, which is a right-wing paramilitary and

8  drug trafficking organization in Colombia that, three

9  years ago, was said to be responsible for approximately

10 30 percent of all the cocaine that was brought into the

11 United States.

12       The Defendant was in charge of a bloc, or a

13 military unit, of approximately 7,000 armed combatants,

14 controlled a large area in northwestern Colombia that was

15 responsible for or was involved in all aspects of the

16 cocaine industry, including overseeing land that grew

17 coca, manufacturing facilities for coca paste and for

18 finished cocaine hydrochloride, transportation routes to

19 the coast, and by sea to Central America, Mexico and to

20 the United States.

21       In 2001 the AUC was designated by the State

22 Department to be a foreign terrorist organization.  Within

23 this organization, not only was the Defendant one of the

24 leaders of nine blocs, or nine subdivisions of the AUC,

25 but he was also on the "Estado Mayor," which is like the

1  ruling council of approximately ten individuals, so he was

2  a very high-ranking individual in this organization.

3        I would say to the Court, in addition there is

4  an ICE detainer on the Defendant.  There is no other

5  reason -- not only does the Defendant have no ties to the

6  community, but he has no legal status in the country,

7  other than his being paroled in as a defendant who's been

8  extradited.

9        I would concur with the Pre-Trial Services

10  officer's conclusion, recommendation, that no condition or

11  combination of conditions would assure the Defendant's

12  appearance at trial or the safety of the community, and I

13  ask that the Defendant be detained before trial.

14        THE MAGISTRATE JUDGE:  Thank you, Mr. Alexander.

15  Mr. Diaz?

16        MR. DIAZ:  Yes, if Your Honor please.  May

17  Ms. Newman also be permitted to approach the podium?

18  Thank you.  Good afternoon, Your Honor.

19        THE MAGISTRATE JUDGE:  Good afternoon.

20        MR. DIAZ:  I'd like to begin by just making a

21  point or objection for the record for potential future

22  purposes in proceeding with any proceedings in the

23  District Court against Mr. Naranjo, for a very simple

24  matter.  It is a position of the defense that

25  Mr. Naranjo's extradition to the United States was

1    premature.  Without getting into legal argument, I just

2    want to put some facts on the record.

3            Mr. Naranjo's extradition was ordered to be

4    accomplished by the Colombia Supreme Court.  He then, or

5    people on his behalf and victims in Colombia under the

6    Justice and Peace Law, filed an appeal to that process.

7    This went to a different court, called the "Judicatura,"

8    J-u-d-i-c-a-t-u-r-a, which has two levels.  Mr. Naranjo

9    prevailed at that first level.  There was then an appeal

10   by the government to the second, or higher, level, at

11   which level Mr. Naranjo lost, about two weeks ago.  I

12   think it was April 22nd.

13           There was one last procedure that had to be

14   accomplished, which was the Constitutional Court of

15   Colombia, that had the last say-so on the issue.  And

16   within literally minutes, if not hours, of the one

17   subordinate level court agreeing to Mr. Naranjo's

18   extradition, he was put on a plane and sent from Combita,

19   C-o-m-b-i-t-a, Prison, through the Bogotá Airport to

20   either Miami or Fort Lauderdale and then to this District.

21           So, just so that there is a record that by us

22   not making this objection at this point in time I would

23   not want there to be a waiver of our first legal issue

24   which I think we're going to have in this case, which is

25   the propriety, or what I would call the "prematureness,"

1    of his extradition.

2           Having said that, I spot several, but three what

3    I would call glaring inaccuracies, with all due respect to

4    the Government, in this written proffer.  The best way I

5    think to handle that would be to allow us to challenge the

6    evidence, or challenge the proffer, and the only way that

7    I can think that that can be done is by cross-examining

8    the person who has a first-hand knowledge, who put that in

9    the proffer.  So my first request would be for the Court

10   to consider our ability to factually challenge and cross-

11   examine three specific areas in the proffer.

12          One is where, on page 2 it says, and I quote,

13   "In August of 2007 Colombian president Alvaro Uribe

14   expelled Mr. Jimenez-Naranjo for continuing his drug

15   trafficking activities while incarcerated."  While that

16   statement may not be totally inaccurate, there are things

17   that occurred after, where different Colombian courts --

18   and we'd need to put on some evidence to establish that

19   that is not exactly what happened following the

20   president's order of Mr. Naranjo's extradition.  It was a

21   much more complex court legal situation which is not yet

22   resolved in Colombia, as I said a moment ago.

23          Number two, quote, "That Mr. Naranjo, he

24   threatened the police and military security personnel who

25   were escorting him and then told him that he had a 7,000-

1  man army and that he would go to war if anything happened

2  to him."  That is something which the defense vehemently

3  denies.  We would certainly like to be able to cross-

4  examine the source of that very, very troubling and

5  serious statement.

6         And third, Your Honor, the proffer on page 4

7  says that Mr. Naranjo does not have, quote, "no known ties

8  to the United States."  That is not an accurate statement.

9         So we are prepared to confront the proffer with

10  a cross or counter-proffer.  We would be asking the Court

11  to consider a motion for leave to compel the Government

12  to bring one or more individuals who have made these

13  statements which are found in the Government's proffer,

14  so that we can challenge and confront that evidence.

15         One moment, Your Honor.

16         And if the Court is willing to grant that

17  request we would ask the Court to consider a motion for

18  any 3500 material that would be relative to that person or

19  those persons' testimony.

20         THE MAGISTRATE JUDGE:  Let me hear the

21  Government's response.  Thank you.

22         MR. ALEXANDER:  Thank you, Your Honor.  Your

23  Honor, the Government doesn't intend to call any

24  witnesses.  The Government is proceeding by proffer.

25  If the defense wishes to call witnesses and that, that's

1   their prerogative.

2          I would say to the Court that with regard to the

3   first three inaccuracies that Mr. Diaz stated, the first

4   two -- the first statement in the Government's submission

5   that dealt with the details of how the Defendant got here

6   or how the Defendant was in this program, this

7   demobilization program, I don't think that's relevant.

8   And if the Court doesn't even consider that in the

9   Government's factual proffer and in what the Government

10  submitted, I don't think it really -- it was provided to

11  the Court as background, and it doesn't really bear on

12  whether or not there are conditions or a combination of

13  conditions that would assure the Defendant's appearance

14  and also whether or not he's a danger to the community.

15         With regard to the second claimed inaccuracy by

16  Mr. Diaz -- that is, the Defendant's statement to law

17  enforcement and military personnel in Colombia that he had

18  an army at his disposal -- again, the Defendant, if he

19  wants to call witnesses to challenge that, that again

20  that's his prerogative.  But in this district, the

21  Government isn't required to put on witnesses and the

22  Government is going to proceed merely by way of proffer.

23  I would say to the Court that even if that statement is

24  taken out and not considered by the Court, that all the

25  other conditions, considered in the aggregate, would still

1  argue in favor of detaining the Defendant prior to trial.

2          Finally, with regard to the Defendant's ties to

3  the community, that is an area that I think is relevant,

4  not that I'm saying I think that would make any difference

5  in the Court's determination, but the defense is clearly,

6  you know, at liberty to provide those facts for the Court

7  in terms of what ties he may have in the community.

8          But as I said, I think the two operative facts,

9  the two most important considerations, are his legal

10 status here and that, even if he were given a bond, he's –

11 – well, I should also -- I failed to mention to the Court

12 or remind the Court that he also has charges in the

13 Southern District of Florida, drug charges and money

14 laundering charges, so that even if there was a bond in

15 this case --

16          THE MAGISTRATE JUDGE:  Under indictment?

17          MR. ALEXANDER:  He is under indictment, yes,

18 Your Honor.

19          THE MAGISTRATE JUDGE:  I see.  Detainer lodged,

20 do you know, in this Court?

21          MR. ALEXANDER:  A detainer is lodged -- an ICE

22 detainer is lodged on this case in this --

23          THE MAGISTRATE JUDGE:  No, the ICE detainer

24 I understand is lodged.  What about any detainer with

25 respect to the pending charges in Florida that might be

1    lodged in the D.C. Jail, for instance, or --?

2             MR. ALEXANDER:  I do not know, Your Honor.

3    I would have to check that.  I know as a matter of course

4    they would do, but I have not --

5             THE MAGISTRATE JUDGE:  Has he appeared before

6    the court in Florida?

7             MR. ALEXANDER:  No, Your Honor.  He touched down

8    in Florida when he was being extradited.  His plane

9    touched down and he was fingerprinted just for

10   jurisdictional purposes because the statute under which

11   he was charged required that that be the first place he

12   enter, but he has not appeared before a court there.

13            THE MAGISTRATE JUDGE:  So he's been indicted but

14   he has not had an arraignment --

15            MR. ALEXANDER:  That's correct, Your Honor.

16            THE MAGISTRATE JUDGE:  -- in Florida.  With

17   respect to Mr. Diaz's suggestion that there's a flaw in

18   the extradition process, that would go, would it not, to

19   the jurisdictional issue before the Court, and I don't

20   know if that's necessarily before this Judge.  As opposed

21   to Judge Collyer.

22            MR. ALEXANDER:  Yes, Your Honor.

23            THE MAGISTRATE JUDGE:  But it does implicate,

24   does it not, the jurisdiction of the Court if indeed he

25   was improperly extradited according to the United States?

1          MR. ALEXANDER:  That would be the issue that

2    would be raised.  I think the case law would support, and

3    I can brief the Court further or another Court, that once

4    he's before the Court the Court has jurisdiction.

5          THE MAGISTRATE JUDGE:  All right.  Thank you,

6    Mr. Alexander.

7          MR. ALEXANDER:  Thank you, Your Honor.

8          THE MAGISTRATE JUDGE:  Mr. Diaz.  If you'd come

9    to the podium, sir.  So we can pick up your voice.

10   Otherwise, it's not --

11         MR. DIAZ:  Yes, sir.

12         THE MAGISTRATE JUDGE:   -- put on tape.

13         MR. DIAZ:  Yes, sir.

14         THE MAGISTRATE JUDGE:  This Court would not get

15   involved in a jurisdictional issue such as the lawfulness,

16   the legality, of Mr. Naranjo being in this country.  I

17   think that's a matter that would be more appropriately

18   presented to Judge Collyer, as the Trial Judge.  This

19   Court is limited, if you will, in making a determination

20   as to whether or not, if indeed he were to be released,

21   he would either be a risk of flight or a potential danger

22   to the community.  Any appeal from any ruling by this

23   Court will go to Judge Collyer.  Has there been a status

24   date set for --

25         MR. ALEXANDER:  Yes, Your Honor.  The 23rd,

1    I believe.

2            MR. DIAZ:  May 23rd.

3            THE MAGISTRATE JUDGE:  May 23rd.

4            MR. DIAZ:  Yes, sir.

5            THE MAGISTRATE JUDGE:  So much of what, it seems

6    to me, gives you pause in terms of the legality of your

7    client being here, is more appropriately addressed.  My

8    function under the Bail Reform Act is to analyze the

9    criteria that Congress has set forth and, as you know and

10   Ms. Newman well knows, one, the nature of the charges

11   being brought give rise to a presumption which puts the

12   burden, I guess, on the defendant to rebut that

13   presumption.

14           You say he has ties to the United States.  He

15   doesn't have legal standing in the United States.  If the

16   Court were to release him, he would be immediately picked

17   up by the Immigration people and either held by them or

18   released by them -- they sometimes do things like that --

19   or they would hold a deportation hearing and send him

20   back, and there'd be a lot of round-robin going on.  And I

21   don't know if that would necessarily be an efficient way

22   of resolving some of these issues that you wish to bring

23   before the Court.

24           So I'm going to deny -- obviously without

25   prejudice -- your request to call witnesses to establish

1  some of the points that you wish to raise, and have that

2  handled by Judge Collyer if she sees fit to pursue that.

3          I'm going to rule, based upon, one, the

4  presumption; two, as I see it, his lack of status.  I'm

5  going to find that he is a risk of flight, mainly because

6  he has no basis to be here, and obviously he's facing

7  serious charges that would perhaps motivate him to leave

8  the country.  He doesn't even have a passport, as far as

9  I know, certainly a passport that he brought with him.

10 So he would have to get a passport before he could even

11 lawfully leave the country if he wanted to.  So I assume

12 that it would be difficult for him to leave the country

13 legitimately.

14          In terms of dangerousness, I don't think the

15 presumption has yet been overcome by you at this juncture.

16 So with a detainer that's outstanding, with the fact that,

17 as Mr. Alexander indicated, that there was a pending

18 indictment down in Florida which could result in a second

19 detainer being lodged with the local jail or authorities,

20 whatever this Court did that would result in this Court

21 releasing him, it would be a Pyrrhic victory for him at

22 this point.

23          MR. DIAZ:  Understood, Judge.

24          THE MAGISTRATE JUDGE:  But you've made your

25 record.

```
1              MR. DIAZ:  What I'd like to be able to do is to

2    proceed with our defense proffer and make some comments

3    and observations.

4              THE MAGISTRATE JUDGE:  Yes, you may do that.

5              MR. DIAZ:  Okay, thank you, Your Honor.

6              THE MAGISTRATE JUDGE:  Before I forget, though,

7    Mr. Diaz --

8              MR. DIAZ:  Yes, sir.

9              THE MAGISTRATE JUDGE:  -- and you can respond to

10   this, as you well know, Mr. Naranjo has the right to be

11   visited by his government consular office or the embassy

12   folks, and to the extent that he might like them to visit

13   with him, I think -- through you -- he should notify the

14   government.  Or they may be notifying them under any

15   circumstances, but if you would prefer not to have them

16   notified you can pass that on to Mr. Alexander.  Because I

17   think they have an obligation to take any action that is

18   requested by the Defendant.

19             MR. DIAZ:  Thank you, Your Honor.  And just for

20   the record on that, Mr. Alexander had asked us to confirm

21   with Mr. Naranjo if in fact to this date that had

22   occurred, and we reported to Mr. Alexander that yes, in

23   fact -- we don't know if it was a call from the agents or

24   somebody else in Pre-Trial Services, but just so the

25   record is clear, Mr. Naranjo was given an opportunity by
```

1   the Government and, again, by his defense counsel, to

2   utilize any assistance that his country may want to offer

3   or which he may want to solicit, and he has respectfully

4   declined that at this point in time.  But he has been duly

5   and timely notified of that.

6         THE MAGISTRATE JUDGE:  Well, we went through

7   that last week, I think --

8         MR. DIAZ:  All right.

9         THE MAGISTRATE JUDGE:  -- Mr. Diaz, but --

10        MR. DIAZ:  It's been done.

11        THE MAGISTRATE JUDGE:  -- I think I indicated

12  at that time I wanted to revisit that issue with retained

13  counsel.

14        MR. DIAZ:  It has been done, Your Honor.

15        THE MAGISTRATE JUDGE:  Right.

16        MR. DIAZ:  Your Honor, what I'd like to do then

17  is respond to, by proffer, to the Government's proffer and

18  then proffer some additional evidence into the record.

19        THE MAGISTRATE JUDGE:  Surely.

20        MR. DIAZ:  As I stated earlier, although the

21  president did expel Mr. Naranjo from the Colombia Justice

22  and Peace Process, we're really talking two different

23  things.  There's extradition, and Justice and Peace.  And

24  what has been clearly established through his Colombian

25  counsel and even in the press in Colombia, is the

1   president has absolute authority on the issue of

2   extradition, but not on Justice and Peace, and you can't

3   extradite until he's out of Justice and Peace.  And so,

4   as I said earlier, our position is that he hasn't been

5   afforded the opportunity to exhaust the Justice and Peace

6   court system in Colombia.

7           THE MAGISTRATE JUDGE:  Well, the Justice and

8   Court -- "Peace," you're saying?

9           MR. DIAZ:  Justice and Peace Process.

10          THE MAGISTRATE JUDGE:  Justice and Peace Process

11  rules on requests for extradition?

12          MR. DIAZ:  They don't.  They're incompatible.

13  You have a court system and you have an executive --

14          THE MAGISTRATE JUDGE:  Right.  Go ahead.

15          MR. DIAZ:  -- and it's pretty much like our

16  system.  The president declared that he was out of Justice

17  and Peace, and the magistrate assigned to Mr. Naranjo's

18  case said, "Oh, no, he's not.  You can order his

19  extradition, but he is in Justice and Peace."  That matter

20  has been litigated through three or four levels.

21          THE MAGISTRATE JUDGE:  Oh, I see.  So that's the

22  basis for your --

23          MR. DIAZ:  Correct.

24          THE MAGISTRATE JUDGE:  -- argument of being

25  premature, that the Justice and Peace Process had to be

1    concluded before he would be eligible for extradition.

2           MR. DIAZ:  Correct.  And I didn't want us

3    appearing here or filing appearances or litigating

4    detention later on to be construed as a waiver of that

5    position.

6           So moving on to the second point, we do deny by

7    proffer that Mr. Carlos Mario Jimenez ever told any police

8    officers in August of '07 that he had a 7,000-man army.

9    In truth and in fact, in December of '04 the Auto Defense

10   or the Self-Defense Forces of Colombia from which

11   Mr. Jimenez is claimed to be one of the leaders or

12   commanders, they were demobilized.  All 7,000 soldiers

13   were registered in a demobilization process, they were

14   disarmed, it was all on video, it was a very well-

15   documented thing in Colombia.

16          So even assuming -- and we deny that there was

17   ever this kind of a threat, Mr. Naranjo, in August of '07,

18   had nothing in the tune of a 7,000-man army to rise arms

19   against the police or permit any type of threat, and that

20   is just belied by the Colombian evidence itself.  That's

21   not just an empty-air argument.

22          And then, third, Mr. Jimenez does have ties to

23   the United States, and I'll explain those to the Court.

24   His father was recently deceased, but his father and his

25   mother -- his mother is currently alive -- do have a

1   residence in South Florida, at 14516 Southwest 95 Lane.

2   That's in Miami-Dade County, Florida.

3        THE MAGISTRATE JUDGE:  His mother lives there?

4        MR. DIAZ:  She goes back and forth, but it is

5   currently being rented out.  It's a rental property.

6   It's not occupied by a Naranjo family member.

7        THE MAGISTRATE JUDGE:  So your assertion of

8   contact is that one of his parents owns a piece of

9   property in Florida.

10       MR. DIAZ:  Owns a piece of property and has

11  lawful travel status to come to and from the United

12  States.

13       THE MAGISTRATE JUDGE:  No, his mother does.

14  But he doesn't.

15       MR. DIAZ:  His mother does.  The father is

16  deceased.

17       THE MAGISTRATE JUDGE:  Yes.

18       MR. DIAZ:  Correct.  Mr. Naranjo, before I go

19  into the other family members, Mr. Naranjo did have a

20  visa, a lawful visa, to come to the United States and has

21  traveled, in fact, to the United States.  He has a minor

22  son who suffers from cerebral palsy and has received

23  significant treatment at a specialized medical facility in

24  Philadelphia and also in Mexico, and so Mr. Naranjo in the

25  early 2000s came, lawfully, into the United States with

1   his son for this medical treatment.

2          What happened is, about two or three months ago

3   Mr. Naranjo was placed on what we call the OFAC or the

4   "Clinton List," the Office of Foreign Assets and Control,

5   and when that happens if you have a visa it's revoked,

6   it's not good any more.  If you don't have one, you're

7   ineligible for one.  But I think it's important to

8   understand that his reason for not having a lawful ability

9   to have a lawful status in this country was of the

10  government's own doing.  They arbitrarily and uniformly

11  say, "You're on OFAC."

12         There's no regulation -- I've challenged it,

13  I've sued OFAC -- that says what the criteria is to

14  determine who is or is not on OFAC.  So I think it's

15  important to understand that he's been in this country

16  several times, he's traveled in and out, he does have a

17  Colombian passport, he could travel lawfully in the

18  country but for the government saying, "We're putting you

19  on the OFAC List."  I agree --

20         THE MAGISTRATE JUDGE:  The next step, of course,

21  is whether or not he would voluntarily travel to the

22  United States to respond to what is essentially two

23  indictments in two different jurisdictions.

24         MR. DIAZ:  Well, I'm going to --

25         THE MAGISTRATE JUDGE:  That's a rhetorical

1   question.

2          MR. DIAZ:  No, I'm going to return to that in a

3   moment, Judge.

4          THE MAGISTRATE JUDGE:  All right.

5          MR. DIAZ:  Bu I want to get through the family

6   members and the ties, and I'll come back to that because I

7   think there's a very important observation to be made in

8   that regard.

9          The following is a list of friends and family

10  members who do have ties and are lawful residents and have

11  lawful properties and lawful professions in the United

12  States whom we have contacted and are ready, willing and

13  able to sign his sureties on a bond and put up their

14  properties.  One is Juan Geraldo and Carmenza Geraldo.

15  This is the sister and the brother-in-law who live in

16  Florida with a house worth approximately --

17         THE MAGISTRATE JUDGE:  Sister and brother-in-law

18  of?

19         MR. DIAZ:  Of the Defendant.

20         THE MAGISTRATE JUDGE:  Yes, okay.

21         MR. DIAZ:  Yes, sir.  Three hundred and eighty

22  thousand dollars.  There are friends, not relatives, but

23  Gustavo Torres and Consuelo Torres, with a $240,000.00

24  house in Miami.  There is a sister who has a home in

25  Texas, free and clear, for $130,000.00, Martha Jimenez.

1   There is a brother, Samuel Jimenez, who has a house in

2   Texas with little equity, but its fair market value is

3   about $108,000.00.  And there are two other close friends

4   to the family, Uriel and Lydia, L-y-d-i-a, Escobar, who

5   own a house in Illinois.  I'm not a hundred percent sure

6   if it's free and clear, but their house is worth

7   $80,000.00.  That house, together with the father and

8   mother's house in South Florida, total approximately just

9   under about a million dollars in surety.

10          Getting back to the Court's comment about his

11  willingness to travel to the United States.  Here's what

12  happened in Colombia in 2004.  Late 2004, the Peace

13  Process began.  Mr. Naranjo was one of the first AUC

14  commanders to take his 7,000 men and lay down their arms

15  and enter into a peace process.

16          They went into an area, into a jail, called

17  La Ceja, L-a, C-e-j-a.  When they got there, as did

18  Mr. Jimenez, they were told whether or not they had

19  outstanding Colombian charges.  Mr. Naranjo had no

20  outstanding Colombian charges.  Many of the people who

21  went into La Ceja, once told that they had no Colombian

22  charges, said, "Here's my contact information, here's

23  where I'm going to be living, here's my phone, I'm not

24  sitting in a Colombian jail, but I am in the Justice and

25  Peace Process."

1         Mind you, the law hadn't come into effect in

2  December of '04, when the demobilization happened.  The

3  demobilization happens in December of '04, the Justice and

4  Peace Law gets signed, I think, July 25th of '05.  It

5  wasn't until '06, for about a year and a half, that

6  Mr. Jimenez voluntarily went into La Ceja, was told, "You

7  have no U.S. indictments, you have no PAWs, provisional

8  arrest warrants, requests for extradition by the United

9  States."

10         THE MAGISTRATE JUDGE:  What was the date of that

11  again, Mr. Diaz?

12         MR. DIAZ:  He goes into La Ceja in -- he

13  demobilizes in December of '04.

14         THE MAGISTRATE JUDGE:  Yes.

15         MR. DIAZ:  And he goes immediately thereafter

16  into the jail, La Ceja Jail.  C-e-j-a.

17         Subsequent to his entry into La Ceja, they then

18  put him in a maximum security facility.  But what I think

19  is important is, if you look at the date of the indictment

20  in this case, which --

21         THE MAGISTRATE JUDGE:  The earlier indictment or

22  the superseding indictment?

23         MR. DIAZ:  The earlier indictment, because

24  certainly when the Government indicts this case, one would

25  have expected, when they had a door to knock on, they had

1   a jail cell to go to, and ask for the extradition of

2   Carlos Mario Jimenez --

3           THE MAGISTRATE JUDGE:  That was June 16, '05.

4           MR. DIAZ:  June 16 of '05.

5           THE MAGISTRATE JUDGE:  Yes.

6           MR. DIAZ:  And the Justice and Peace law gets

7   signed the following month.  For the next 20 months, the

8   Government knows where to get him.  He doesn't know --

9           THE MAGISTRATE JUDGE:  Which government, the

10  U.S. government?

11          MR. DIAZ:  The U.S. government.  He doesn't know

12  he's indicted, admittedly.  He doesn't know he's indicted.

13  But he goes to a place where he knows he's got no

14  Colombian charges, and if he is going to get indicted they

15  simply go to cell block AB123, pick him up, put him on a

16  plane, and he comes to the United States.

17          And what I find particularly interesting is that

18  he does this for a period of about 20 months.  And during

19  those 20 months -- I met Mr. Naranjo several times during

20  that period of time, and here's what I found.  When he

21  would come to see me, in an authorized, documented legal

22  visit, he could not leave La Ceja.  He could not leave

23  there unless he was under the guard.  When he came to see

24  me, by my count it was about 40 or 50 DAS, Department of -

25  - it would be like our FBI -- agents who trucked him

1   across the country to visit with his lawyers, with myself

2   and others, and he --

3           THE MAGISTRATE JUDGE:  In Colombia?

4           MR. DIAZ:  Yes.

5           THE MAGISTRATE JUDGE:  Okay.  All right.

6           MR. DIAZ:  Yes.  And so he was under constant

7   vigilance inside the jail of La Ceja, whenever he went out

8   with a special permit he was also under the vigilance of

9   the police.  All of this time while he's under a U.S.

10  indictment.  The United States wanted to bring him in

11  earlier, they really could have.

12          And I just find it curious -- and I don't want

13  to get into much argument, because I want to stay on my

14  proffer, but I just find it curious that you say this

15  man's a risk of flight and a danger to the community, you

16  know where he's at, he's got a very serious and sober

17  indictment against him, and you just let him go for the

18  next two or three years.  I quite frankly, I don't

19  understand that, but that's argument and logic.  Getting

20  to the proffer --

21          THE MAGISTRATE JUDGE:  But he was restrained,

22  was he not?  In Colombia?

23          MR. DIAZ:  He was in La Ceja and he had to go

24  to -- but, for example.  He would come to the lawyer's

25  office, police would always stay outside at a safe

1    distance and we were able to manage our, you know --

2           THE MAGISTRATE JUDGE:  But he wasn't free to go

3    off and visit his friends --

4           MR. DIAZ:  No.

5           THE MAGISTRATE JUDGE:  -- in Venezuela or

6    wherever.

7           MR. DIAZ:  No, not to that extent.  No, Your

8    Honor.  No.  But certainly the ability to escape was

9    significant if he really was a risk of flight and danger.

10   But I think more importantly --

11          THE MAGISTRATE JUDGE:  But you said he didn't

12   know about the indictment in the U.S.

13          MR. DIAZ:  No, but here's what he did know.

14   Once July 5th of '05 comes out, he knows now that he is

15   now -- he registers into the Justice and Peace law.  And

16   under Colombian law, if you violate Justice and Peace --

17   which can happen in a variety of ways, I won't bore you

18   with them, but one of which is you continue to engage in

19   criminal conduct.  A la superseding indictment, a la

20   Florida indictment which talks about events in '06 and

21   '07.  If that happens, you go into your -- you are bounced

22   out of Justice and Peace, you are rejected, and you go

23   under a Colombian alternative sentencing called the

24   "ordinary sentence," which is 40 years in prison.

25          In other words, Mr. Naranjo, from the time he

1   demobilized -- from the time the Justice and Peace law

2   comes out in July of '05 until he arrives in the United

3   States last week, knew that, "If I commit another

4   violation, forget about extradition to the United States,

5   I get 40 years here in Colombia." And I think that that's

6   very, very significant.

7         THE MAGISTRATE JUDGE: Well, I want to follow

8   what you're saying, even though it's for the record. The

9   superseding indictment came out on September 25 of '07.

10   That was last year. Are you suggesting that the U.S. knew

11   of the alleged criminal conduct that they've charged him

12   with, but the Colombian authorities also knew of that?

13         MR. DIAZ: I don't know. What I know is that

14   the superseding gets unsealed in September of '07. What

15   I'm saying is, only the Government knows, because they

16   have access to the --

17         THE MAGISTRATE JUDGE: Only the U.S. government.

18         MR. DIAZ: The U.S. government.

19         THE MAGISTRATE JUDGE: Right. So you're saying

20   that if he had violated the law while he was under this

21   Peace Process, the authorities in Colombia would have

22   taken punitive action against him.

23         MR. DIAZ: And/or the United States would have

24   simply unsealed a two-year-old indictment to take him into

25   custody and prevent him from continuing to commit crimes.

1  In addition to the fact that he knew that he had --

2  I think what's significant is he voluntarily surrendered

3  into La Ceja without any crimes against him, knowing that

4  if he was caught committing a crime he'd do 40 years in

5  Colombia.  And it just goes to the issue of risk of

6  flight.

7           THE MAGISTRATE JUDGE:  Yes.  But of course this

8  Court doesn't know of any legal or political reasons for

9  the machinations that go on in discussions between

10 governments, Mr. Diaz.

11          MR. DIAZ:  I understand, Judge.

12          THE MAGISTRATE JUDGE:  On that.  So --

13          MR. DIAZ:  I would like --

14          THE MAGISTRATE JUDGE:  Yes, go ahead.  Go ahead.

15          MR. DIAZ:  Can I just talk about the ICE

16 detainer, because I think that's important as well, Your

17 Honor.

18          Simply because a defendant has an ICE detainer -

19 - if a defendant has an ICE detainer, the defendant can

20 still make bond.  What happens is, if they make bond the

21 detainer attaches, they go to that district -- in this

22 case it might even be the Southern District of Florida,

23 although I'm not aware of that detainer -- and/or the ICE

24 Immigration, and an Immigration judge decides.  First I

25 think it's an INS trial attorney and then an Immigration

1   judge decides if they're eligible for a bond.

2          What I have seen happen before is they usually

3   double or equal or double the bond of the District Court.

4   If the defendant can't make it, what I've seen happen,

5   interestingly enough, is the defendant asks to be remanded

6   back to the custody of the U.S. Marshals.  Why?  Because

7   they don't get credit for time on the criminal case while

8   in INS custody.  But I most respectfully suggest that the

9   fact that he may have or does have an ICE detainer in and

10  of itself is something that if he's granted bond we can

11  address later, should that come to pass.

12         I would like to make a couple of comments which

13  are not in the Government's written proffer but

14  Mr. Alexander proffered here at the podium, and then I'll

15  see if Ms. Newman has anything she wants me to add.  And

16  that is regarding the Florida case.

17         An interesting aspect of the Florida case is

18  that that Miami indictment has actually been charged, that

19  crime has been charged in Colombia, against all of the

20  same individuals except Mr. Jimenez-Naranjo.  He has not

21  been indicted in that case.  That case is being fought,

22  and I am reported by the Colombian attorneys, very

23  successfully in Colombia.  My understanding is that a

24  prosecutor, whose last name I don't know but her first

25  name is Margarita, or a police officer and head

1    investigation -- I wasn't able to get clarity on which of

2    the other -- was in some kind of hearing or deposition or

3    proceeding and cross-examined, and I am reported by the

4    Colombian attorneys that that cross-examination led the

5    Colombian attorneys representing the charged defendants in

6    that Colombian case, which is a mirror image of the Miami

7    case, that that case is crumbling very quickly.  And I

8    find it very interesting that Mr. Naranjo is not charged

9    in that case.

10           I can tell the Court that with regards to the

11   weight of the evidence, under 3142(g) of the D.C. case and

12   of the Miami case, unless I'm missing something in the

13   proffer or the Government specifically didn't want us to

14   know about it, I can report to the Court that there's no

15   agent contact, there's no undercover UCA contact, there is

16   no CI contact, there are no consensually recorded

17   conversations with Mr. Naranjo, there's no Title 3,

18   there's no confessions, there's no admissions.  What I see

19   is loads of cocaine that are seized, and people who are

20   going to say that the cocaine on that boat belonged to

21   Mr. Naranjo.

22           Now, I've been doing this for 20 years and I've

23   seen those cases go both ways, admittedly, you know.  Who

24   knows.  I agree that the presumption is raised by the

25   charges of the risk of flight and danger, but I think in

1 terms of looking at the weight of the evidence we need to

2 kind of understand what we're really dealing with here --

3       THE MAGISTRATE JUDGE:  That's why we have a

4 trial.

5       MR. DIAZ:  Right, no, no, I understand, and we

6 very well may have in this case.  But we may not have it

7 if we had confessions, we may not have it if we had

8 admissions, and I just want to report one last thing to

9 the Court and then I'll either turn it over to Ms. Newman

10 or, if Your Honor will not permit that, I'll ask her to

11 chime in.

12       About a year and a half ago, when I was in

13 Colombia, there was an article that came out in what would

14 be our Time Magazine, Semana, S-e-m-a-n-a.  And it caught

15 my attention because at the time Mr. Naranjo was in a

16 jail, the high-security prison I talked about earlier,

17 called Itagui, I-t-a-g-u-i.  And the featured article was

18 how all of the -- everybody using phones inside of Itagui,

19 their phones were intercepted.  The report in the

20 Colombian press was that the DEA and British intelligence

21 had electronic surveillance in the area, and every call,

22 regardless of what phone, it was all done by voice

23 recognition, everybody who made a call from Itagui, their

24 phones were recorded.  And it talked about how there was

25 just basically nothing you could say that wasn't recorded.

1          And I think that's important in terms of the

2     weight of the evidence, because I would think that if the

3     Government had something more than co-conspirator, biased

4     motivated testimony, and seized loads, and Mr. Naranjo

5     were putting these loads together as they claim in the

6     superseding indictment, from '05, '06 and during '07, that

7     there would be one intercepted message from somebody

8     coming into or out of the jail, there would be one

9     intercepted phone call and that would be the smoking gun.

10    And from an evidentiary standpoint, it would be match

11    point and game.

12          And so all I want to alert the Court to with

13    that proffer is that I think that both cases -- perhaps

14    the Florida case is a much more tryable case than the case

15    in this District, and for those reasons we would be asking

16    the Court consider a bond.

17          Can I just check with Ms. Newman to make sure I

18    didn't --

19          THE MAGISTRATE JUDGE:  Before you turn to --

20          MR. DIAZ:  Yes, sir.

21          THE MAGISTRATE JUDGE:  -- your colleague.  You

22    initially indicated to the Court that you thought the

23    extradition process was flawed in Colombia.

24          MR. DIAZ:  Yes, sir.

25          THE MAGISTRATE JUDGE:  Is there any appellate

1  mechanism that can go forward, with or without

2  Mr. Jimenez-Naranjo's presence there?  It seems to me, can

3  that be challenged?  You say that there was a disagreement

4  between the executive branch or administrative, and the

5  Peace Process.  There must be some -- I would assume there

6  was some mechanism of challenging what occurred over

7  there.  Certainly you can't challenge that here.

8           MR. DIAZ:  I understand, Judge.

9           THE MAGISTRATE JUDGE:  We don't have

10  jurisdiction in this Court.

11          MR. DIAZ:  I understand the Court's position.

12  My understanding -- excuse me, my understanding is that

13  there is a higher -- it's sort of like the Supreme Court

14  of the United States.  Their Supreme Court is lower than

15  our Supreme Court.  And it would be, as I understand it,

16  the equivalent of a petition for writ of cert.  You can

17  seek access --

18          THE MAGISTRATE JUDGE:  Has that been done?  On

19  behalf of your client?

20          MR. DIAZ:  I'm sure, I'm sure that they are

21  trying to do that, Judge.  The only thing is, this is new

22  ground, even for the Colombian courts.  The Justice and

23  Peace is a new law.  So everything -- I wouldn't be

24  surprised if they say, "Well, you're right.  We are going

25  to hear his appeal."  And if they determine that he was

1    prematurely extradited, I'm not sure how it would work out

2    in a U.S. Court.  Certainly, we know how it would work out

3    if they decided the other way, i.e., it's too late, he's

4    already over there.

5              THE MAGISTRATE JUDGE:  He's being charged here

6    for offenses which the U.S. government is suggesting

7    impacted or violated this law in this country, and I don't

8    know what would happen, but I -- you know, all I'm saying

9    is that your argument that there was a flawed process over

10   in Colombia, at this juncture, seems to me to be too

11   little, too late.

12             MR. DIAZ:  I'm not trying to argue it too

13   little, too late.  I'm just trying to make an observation,

14   an objection for the record.  I've read the Camarena case,

15   and the last thing I want is for somebody to say, "You

16   should have said something the first time you went into a

17   federal court."

18             THE MAGISTRATE JUDGE:  Well, you certainly most

19   eloquently have laid out all the points, Mr. Diaz --

20             MR. DIAZ:  Thank you, Judge.  Just one moment,

21   if I can.

22             THE MAGISTRATE JUDGE:  -- and why don't you

23   confer with your colleague.

24             MR. DIAZ:  Judge, totally unrelated to the issue

25   of detention and I don't know if you want to wait to rule

1    on that, there were a couple of just administrative

2    matters we would like to address with the Court, if we

3    could.  I can do them now or I can wait until you rule.

4           THE MAGISTRATE JUDGE:  Administrative matters

5    with respect to what issue?

6           MR. DIAZ:  Mr. Naranjo-Jimenez's medical needs

7    at the jail.

8           THE MAGISTRATE JUDGE:  Well, why don't you

9    reserve that to -- well, is that the extent of your

10   further argument?

11          MR. DIAZ:  That, and there were two other

12   issues, there were three administrative issues.

13          THE MAGISTRATE JUDGE:  What's the other two

14   issues?

15          MR. DIAZ:  Okay.  One is the issue of our

16   ability to bring cell phones into the building.  I know

17   before --

18          THE MAGISTRATE JUDGE:  All right.

19          MR. DIAZ:  -- if you weren't a D.C. lawyer, we

20   had to get a permit.

21          THE MAGISTRATE JUDGE:  All right, yes.  All

22   right.

23          MR. DIAZ:  And the other one is, Ms. Newman and

24   I are his counsel of record.  And one of the concerns that

25   we have with Mr. Naranjo being who he is and the profile

1   which he has -- and this would not be the first time this

2   has happened in 20 of years of practice -- will be

3   unilaterally solicited by other people -- press,

4   paralegals, interpreters, lawyers.  Mr. Naranjo has

5   authorized us to request the Court to consider an order

6   that we can serve on the jail that says the only people

7   who can visit him as a legal or social visitor are the

8   following people who he designates, so we don't have --

9   I'm not saying agents would go in there, I'm not concerned

10  about Messiah.  I'm concerned about the improper

11  approaching of a knowingly represented individual in order

12  to come in and try to assume their representation.

13         THE MAGISTRATE JUDGE:  Well, I can't speak for

14  the Jail, Mr. Diaz.  All I can tell you with respect to

15  that is that I would assume that the individual resident

16  at the jail can determine who he or she wishes to meet

17  with over there, i.e., if someone from the Embassy decided

18  to go and visit your client and he didn't want to meet

19  with them, I don't think they could force him to meet with

20  them and talk with them.  So I understand that.

21         I'm going to defer your administrative issues

22  until the Court has made a determination, and the Court's

23  determination is that the Court finds, by clear and

24  convincing evidence, that there are no conditions or

25  combination of conditions that would warrant the release

1    of Mr. Jimenez-Naranjo on bond, and also, the Court

2    further finds, by a preponderance of the evidence, that

3    if released he would be a flight risk.

4            The Court also notes that there is a detainer

5    lodged with the prison authorities by the Immigration and

6    Customs Enforcement folks, and also that there's a

7    likelihood of a further detainer that might emanate from

8    the, I assume, Southern District of Florida, where

9    Mr. Jimenez-Naranjo has also been indicted on, I assume,

10   violations of the Controlled Substances Act.

11           So.  The Court will rule, obviously -- the

12   Court's ruling can at any time be revisited by the Trial

13   Court, and you will be meeting with the Trial Court on

14   the 23rd, I understand, of this month, at which point

15   Judge Collyer can also reconsider any ruling by this

16   Court.

17           With respect to telephones, I think, Mr. Diaz

18   and Ms. Newman, I think, having been admitted pro hac

19   vice, I think you're now going to find that you will be

20   authorized to bring cell phones in.  Do your cell phones

21   have cameras with them?

22           MR. DIAZ:  I have one with and one without.

23   I can bring the one without.

24           THE MAGISTRATE JUDGE:  Well, if you use one

25   without --

1          MR. DIAZ:  Okay.

2          THE MAGISTRATE JUDGE:  -- it's going to be less

3  threatening to the security people.

4          MR. DIAZ:  Yes, sir.

5          THE MAGISTRATE JUDGE:  Similarly, Ms. Newman.

6  And that can be arranged.

7          And the third one is the medical condition of

8  your client, and whatever information you have -- he has

9  medical problems?

10          MR. DIAZ:  Yes.  Ms. Newman actually knows them

11  a little better than I.  My understanding --

12          THE MAGISTRATE JUDGE:  Well, we ask for counsel

13  to be as specific as possible.

14          MR. DIAZ:  Okay.

15          THE MAGISTRATE JUDGE:  With the medical alert.

16  The jail itself has an infirmary, and if he needs

17  medication they will provide the medication.  Clearly,

18  you'll have an opportunity to meet with him to make sure

19  that they're complying with his medical needs.  Should you

20  learn that they are not, you will either speak to the

21  Trial Judge or to me or whatever magistrate is sitting in

22  Criminal, to make sure that he is getting the medication

23  and treatment that is warranted under the circumstances.

24          With respect to an order restricting -- I can't

25  restrict who can go to the jail to seek to visit with him.

1  Mr. Alexander, I don't know -- my understanding with the

2  jail, if an individual resident there doesn't want to meet

3  with anyone, I don't think the jail authorities can

4  require that he meet with someone.  Obviously, you're not

5  going to send any of your law enforcement folks -- I would

6  hope not, anyway.

7         MR. ALEXANDER:  No, Your Honor.

8         THE MAGISTRATE JUDGE:  Without permission of

9  counsel being there.

10         MR. ALEXANDER:  Yes, Your Honor.  I think,

11  unless it's for security purposes, that you could not

12  limit who an inmate would see.  I know that they can

13  monitor exactly who they are seeing, but I haven't heard

14  that before.  I'm not familiar with the practice of doing

15  that.

16         THE MAGISTRATE JUDGE:  Mr. Diaz or Ms. Newman,

17  I would like you perhaps to meet with or speak to the jail

18  people.  There is an attorney, I think a Ms. Amato, who

19  handles that.  She's with the Department of Corrections,

20  D.C., the District of Columbia government, that's

21  responsible for the D.C. Jail.  And she, I think, will be

22  very helpful for you.  It's possible that with respect to

23  an individual that perhaps you can be notified.  But

24  you're not going to be here every day, I guess, until the

25  trial.

1          But to the extent that something can be done

2    that's lawful in terms of restricting who can visit with

3    your client, I'm sure Judge Collyer or this Court would be

4    amenable to accomplishing what you want, that he not be

5    importuned into giving statements or discussions or that.

6    So I think that can be worked out.  But why don't you

7    touch base with the jail, and what you might do is speak

8    with the Pre-Trial Services folks in this courthouse and

9    find out who it is specifically you should be speaking to,

10   or even the Marshals Office.

11          MR. DIAZ:  Very well, Judge.

12          THE MAGISTRATE JUDGE:  They will be helpful on

13   that.

14          Before you leave the courthouse, check with the

15   security people about bringing in your telephones.  And if

16   they need an order, I will issue an order to that effect.

17          MR. DIAZ:  Thank you, Judge.  The medical

18   information, can we give it to your courtroom deputy?

19          THE MAGISTRATE JUDGE:  Yes, indeed.

20          MR. DIAZ:  We'll do that.

21          THE MAGISTRATE JUDGE:  And that will go with the

22   commitment order.

23          MR. DIAZ:  Thank you, Judge.

24          MR. ALEXANDER:  Your Honor, one other

25   administrative matter.  I've spoken with opposing counsel.

1   The Defendant's second last name ends in an "o" rather

2   than an "a."  And I know that when both sides have filed,

3   submitted pleadings, they've submitted it as "Naranjo" and

4   it comes up as "Naranja."

5          THE MAGISTRATE JUDGE:  Well, the jacket of the

6   criminal case, I see, has been changed.

7          THE CLERK:  I believe the original indictment

8   had an "a," and the superseding had an "o."

9          MR. ALEXANDER:  Okay.

10          THE MAGISTRATE JUDGE:  The superseding

11   indictment –– Kim, show this to Mr. Alexander.

12          [Inaudible discussion]

13          THE MAGISTRATE JUDGE:  We'll see what we can do

14   about that.

15          COUNSEL:  Thank you, Your Honor.

16          THE MAGISTRATE JUDGE:  I assume that you've

17   entered your appearance –– or will enter ––

18          MR. DIAZ:  Yes, Your Honor.

19          THE MAGISTRATE JUDGE:  So that we know where to

20   reach you and ––

21          MR. DIAZ:  We left all our contact information

22   with the courtroom deputy, but the notice of appearance

23   will have it as well.

24          THE MAGISTRATE JUDGE:  All right.  And

25   telephone, all right.  All right, the Defendant will be

1    held without bond, pending further action by the Trial

2    Court.

3             If there's nothing further, counsel, you may be

4    excused.

5             COUNSEL:  Thank you, Your Honor.

6             (Whereupon, the proceedings were concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

UNITED STATES OF AMERICA )
                         )   Criminal No. 05-0235
DISTRICT OF COLUMBIA     )

        I, PAUL R. CUTLER, do hereby certify that a recording of the foregoing proceedings in the above matter was duplicated from an original recording by the Office of the Clerk, United States District Court for the District of Columbia, and that said duplicate recording of the proceedings was transcribed under my direction to typewritten form.

                          _____
                                  PAUL R. CUTLER

        I do hereby certify that the foregoing transcript was typed by me and that said transcript is a true record of the recorded proceedings to the best of my ability.

                          _____
                                  BONNIE FURLONG