UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CASE NO. 05-CR-00235

UNITED STATES OF AMERICA,

       Plaintiff,

v.

CARLOS MARIO JIMENEZ-NARANJO,

       Defendant.

_____/

## DEFENDANT, CARLOS MARIO JIMENEZ-NARANJO'S, MOTION TO DISMISS THE SUPERSEDING INDICTMENT[1] FOR POST INDICTMENT PRE-ARREST DELAY, MEMORANDUM OF LAW, AND REQUEST FOR HEARING[2]

For this motion, the Defendant, CARLOS MARIO JIMENEZ-NARANJO ("Mr. Jimenez") states:

## I.  BACKGROUND

### A.  Colombia's Government and the Communist Guerillas

1. The Republic of Colombia's government was declared in 1886 and has a long tradition of constitutional government. The Liberal and the Conservative parties (founded in 1848 and 1849 respectively) are the two oldest surviving political parties in the Americas. Tensions between the two have frequently erupted in violence, most notably in the Thousand Days War (1899-1902) and later with another war, La Violencia, beginning in 1948. Today, the government of Colombia takes place within the framework of a presidential democratic republic as established in the Constitution of 1991.

---

[1] The defense calls the second (standing) indictment a superseding indictment, but the actual document filed in the clerk's office is titled "INDICTMENT"

[2] The defense respectfully suggests that a hearing on this motion without evidence, will take several hours and with evidence could take several days. To that end, a status conference on this motion would be appropriate to narrow whether evidence will be necessary and to identify and coordinate all necessary witnesses and time needed to present all such evidence.

2.  Since the 1960s, several communist guerilla groups have emerged in Colombia such as the "FARC", the "ELN", the "EPL" and the "Quintin Lame".[3] These groups have regularly engaged in violent attacks (including shootings and bombings) against the Colombian National Police, Colombian military forces, Colombian judges, Colombian politicians, resulting in thousands of deaths, all in the name of "revolution". They have also engaged in other random acts of violence injuring and killing thousands of innocent civilians. The FARC and the ELN are still active in Colombia today, although the Colombian press reports that their leaderships have recently weakened.

3.  These groups have traditionally been accused of financing their "military operations" primarily through the drug trade by "taxing" farmers, cattle owners, businesses and other people across Colombia and by appropriating massive amounts of privately owned real and personal property from defenseless citizens utilizing strong-arm tactics.

4.  The Colombian government has historically been inept in propagating these groups, particularly in the rural areas of Colombia, leading to a tremendous amount of oppression, displacements of entire villages, violence, mass murders and sharp criticism against the Colombian government.

### B.  The Paramilitaries/Anti-Guerrilla Forces

5.  In the early 1990s, 8 of the 11 brothers and sisters of the "Castaño family", as well as the father, were senselessly killed by communist guerillas in Colombia. A surviving brother, Fidel Castaño, set out to avenge their deaths. He initiated a small group of armed men (mainly cattle owners) from his home town, Córdoba[4] and called them "Las Autodefensas

---

[3] FARC is an acronym for "Fuerzas Armadas Revolucionarias de Colombia" or, "Colombian Armed Revolutionary Forces"; ELN is an acronym for "Ejercito de Liberacion Nacional" or, "National Liberation Army". EPL is an acronym for "Ejercito Popular Liberal" or, "Popular Liberation Army".

[4] Colombia is divided into 32 departments (or states) and one capital district. Departments are subdivided into municipalities which, in turn, are subdivided into "corregimientos" (or towns).

Campesinas de Córdoba y Urabá"[5] ("ACCU"), a group with right-wing ideologies. The ACCU essentially started as a political-military, private security force, whose purpose was to stave off the communist guerillas from dominating Córdoba.

6. Shortly after the AUC's creation, Fidel Castaño disappeared, believed to have been killed by the communist guerrillas. So, two of his surviving brothers, Carlos Castaño ("C. Castaño") and Vicente Castaño ("V. Castaño") took over the ACCU and continued its cause.

7. The ACCU recaptured areas which had previously been controlled (and exploited) by the communist guerillas for decades, even beyond the borders of the Córdoba department. Thus, the ACCU was later renamed (more appropriately) as "Las Autodefensas Unidas de Colombia" [6] ("AUC").

8. Within a few years, the AUC grew by seismic proportions and spread throughout Colombia with C. Castaño as its maximum commander. By 1998, the AUC had about 4000 members and by 2002, their numbers had swelled to 13,000 members. By the time the last declared members demobilized in 2006, its numbers had reached about 32,000.

9. As the AUC grew, C. Castaño appointed select members to the position of "comandante"[7] and assigned each one to a "bloque"[8], representing a certain geographic region in Colombia. While each AUC block was autonomous, each AUC block commander recognized C. Castaño as the AUC's maximum commander.

10. In 1997, Mr. Jimenez became the AUC commander of the "Bloque Central Bolivar"[9].

---

[5] "The Self-Defense Forces of Cordoba and Uraba Farmers".
[6] "The United Self-Defense Forces of Colombia".
[7] "commander"
[8] "block"
[9] "The Block of Central Bolivar"

11. As the AUC expanded, it successfully fought and displaced communist guerillas from many areas they controlled across Colombia and in doing so, restored civility, order, progress and safety to the populations in those areas. As a result, in the AUC's beginning, Colombians warmly welcomed and applauded the AUC.

## C. U.S. Interests – Extradition Law

12. But just like the communist guerrilla groups, the AUC was accused of financing its operations through illegal "taxations" and participation in the drug trade. These reports drew the attention of the U.S. Department of State and several U.S. drug law enforcement agencies.

13. However, *at the time*, Colombia had no extradition treaty (or extradition law) with the U.S. As such, the U.S. government's ability to exercise its long-arm reach into Colombia and bring any major Colombian drug violator/target to face justice in the U.S., was illusory.

14. On December 17, 1997, Colombia passed an extradition law, leading U.S. drug law enforcement to believe that it now had the weapon it lacked earlier to pursue several major Colombian drug targets. That celebration was short lived because from December 17, 1997 until mid-2002, the *then* President of Colombia, Andres Pastrana ("President Pastrana"), extradited only a very small fraction of the Colombian targets the U.S. demanded.[10]

15. But that would later change. On August 7, 2002, Alvaro Uribe ("President Uribe") was elected as the next President of Colombia. Unlike his predecessor, President Uribe

---

[10]The Colombian media has accused President Pastrana of being afraid to extradite Colombians to the United States.

immediately and aggressively enforced the 1997 extradition law between Colombia and the U.S.[11]

16. The U.S. State Department also flexed *its* muscle and included the AUC on its list of "international terrorist groups", sending a signal to the AUC that despite its claimed cause of liberating Colombians from communist guerillas, the U.S. nevertheless viewed the AUC as a terrorist group.

17. The U.S. government and its drug law enforcement agencies, now armed with extradition capabilities *and* a "zero tolerance" Colombian president, responded. They reignited their criminal investigations which later would lead to the indictments of several major Colombian drug targets.

18. By that same time (circa 2002), Colombia's tolerance for the AUC had grown thin. After many years of armed conflict between the AUC and the communist guerillas, Colombian citizens, politicians, police, military and President Uribe had had enough. Several international human rights organizations were claiming that the AUC's "cure" had become equal to, or worse than, the decades of suffering occasioned by the communist guerillas. The International Court of Justice (or World Court) began to take aim at and criticize the AUC, threatening to charge AUC commanders with crimes against humanity.

19. Backed by a new, fearless and incorruptible president, Colombian prosecutors began to open domestic/Colombian investigations against several AUC commanders and members for alleged violations of Colombia's criminal laws.

20. However, the much bigger problem for the AUC was when, on September 17, 2002, only one month after President Uribe was elected, the U.S. government indicted C. Castaño out

---

[11] In his first three months in office, President Uribe extradited 207 Colombians to the United States.

of Washington, D.C.  *See, U.S. v Castaño-Gil, et al*, (02-CR-00388-ESH). [12] The U.S.

government immediately sought C. Castaño's arrest and extradition.  Based upon

President Uribe's then clearly expressed attitude of extraditing major drug trafficking

suspects to the U.S., there was every reason to believe that C. Castaño was such a priority

to U.S. drug law enforcement, that he would soon be captured in Colombia and whisked

to Washington D.C..

### D.  The AUC Peace Process (2002 to 2005)

21. In reaction, C. Castaño quickly devised a plan to delay his potential extradition to the U.S.

by copying a peace/amnesty process successfully utilized years earlier by the "M-19"

guerilla group in Colombia[13], and publicly expressed that the AUC would commence a

"proceso de paz"[14] of its own.

22. The AUC's peace process was expected to result in the passage of a new law which

would be called "La Ley de Justicia y Paz"[15].  The general concept of this anticipated law

was for the AUC to deactivate by demobilizing all of its commanders and members, for

them to surrender their weapons, confess to and resolve any of their crimes, cooperate

with Colombian prosecutors, confront and apologize to their victims and their victims'

families, make restitution for them, and, receive a criminal sentence far less severe than

otherwise required by law.

23. C. Castaño named several AUC commanders as AUC peace process "negotiators",

including Mr. Jimenez. In response, President Uribe put together a Peace Commission,

---

[12] The government initially filed a motion to seal the indictment [D.E. 2], which the Court granted [D.E. 3]. However curiously, three days later, the government moved to unseal the indictment [D.E. 4], which the Court granted three days later [D.E.5].
[13] From 1989-1991
[14] "the peace process"
[15] "the Justice and Peace Law"

headed up by the High Commissioner for Peace, Luis Carlos Restrepo and the Minister of the Interior, Sabas Pretelt de la Vega.

24. The Peace Commission and the AUC negotiators met for two years to develop the Justice and Peace Law. The first negotiation meeting was on November 23, 2002, in South Bolivar.  The second negotiation meeting was on January 29, 2003, in Caucasia. About a dozen more meetings followed thereafter. Mr. Jimenez sat at those meetings and participated heavily in the peace process. The opposing sides waged a legislative battle to settle the terms and conditions of demobilization and the anticipated law that would follow and apply to demobilized AUC personnel.  They conflicted over roadblocks such as impunity for crimes against humanity, U.S. extradition requests and drug-trade infiltration. Notably, most Colombians heralded the peace process as positive for Colombia.

25. Between June, 2003 and mid-2005, as part of the peace process, most of the AUC commanders and most of their members demobilized, disarmed, and presented themselves to a "protected zone" called Santa Fe de Ralito,[16]  where they were to remain  until a Justice and Peace Law could be proposed to Colombia's congress and passed into law.

26. At Santa Fe de Ralito, each demobilized AUC commander (or member) had to register upon entry and exit. To leave Santa Fe de Ralito, each AUC commander had to obtain a permit called a "Salvo Conducto"[17] and be accompanied by Colombian law enforcement to and from wherever he needed to go.

27. In March, 2004, Mr. Jimenez voluntary went to Santa Fe de Ralito, registered under his full, legal name and remained easily locatable.  Whenever he left Santa Fe de Ralito, he

---

[16] "Some AUC commanders refused to demobilize. Most of the "front-line" soldiers demobilized and disarmed but remained at large.
[17] "Right of Safe Passage"

7

had to provide an itinerary and be accompanied by an authorized Colombian government security force.

28. In the spring of 2005, Mr. Jimenez obtained U.S. legal counsel who placed the U.S. Attorney's Office, in Washington D.C., on notice of such representation.

<u>**The Justice and Peace Law**</u>

29. By mid 2005, the Justice and Peace Law had been fully negotiated and was pending passage by Colombia's congress. Everybody, including U.S. drug law enforcement agencies, knew exactly what this proposed law would mean and *not* mean for the AUC.

30. The core provisions of the Justice and Peace Law required that the candidate: **1)** actually be a paramilitary; **2)** demobilize if he/she had not yet demobilized; **3)** remain locatable; **4)** register and receive a photograph identification/registration card; **5)** give a "version libre"[18], admitting to all of his (or her) crimes to a Colombian Justice and Peace prosecutor assigned to his/her case; **6)** confront his/her victim(s) and the family of same; **7)** disgorge all if his/her ill-gotten gains to repair any victim(s) of the candidate's crime(s); and, **8)** cease from any criminal activity after demobilization. *The Justice and Peace Law, however, did not repeal or change the 1997 extradition law.*

31. Justice and Peace prosecutors would be assigned to the respective demobilized AUC commanders. Based upon the candidate's confessions and/or other evidence, these Colombian prosecutors would file criminal charges against the candidates.[19] The candidates would then be arraigned on the charge(s), plead guilty to same, be convicted and then get sentenced under an "ordinary" Colombian criminal justice sentence. Most of the crimes charged carry a forty (40) year term of imprisonment. The case would then go

---

[18] "confessional statements"
[19] Some candidates had pre-existing criminal charges which were simply incorporated into the Justice and Peace process.

to a Justice and Peace magistrate called "El Magistrado de Control de Garantias"[20] who would adjudicate which candidates were eligible to receive the benefits of the Justice and Peace Law.  If denied, the ordinary sentence would stand. If declared eligible, all of the criminal convictions (and sentences) would run concurrent, and, depending on certain mitigating or aggravating factors, the magistrate would dictate an alternative/reduced sentence within a range between five to eight years of prison in Colombia. The candidates would receive credit for all time previously served in a Colombian jail or prison under the peace process.

32. On June 16, 2005, Mr. Jimenez was indicted in this district and charged with one count of conspiracy to manufacture and distribute five (5) kilograms or more of cocaine, intending and knowing that the cocaine would be unlawfully imported into the U.S., in violation of Title 21 U.S.C. § 963, and, for aiding and abetting, in violation of Title 18 U.S.C. § 2. The indictment also carried a forfeiture count.

33. A few weeks later, the Justice and Peace Law formally went into effect in Colombia.

34. Consequently, Santa Fe de Ralito had now served its purpose and the AUC commanders were free to remain at large but still had to remain locatable as the Justice and Peace Law got underway.

35. From July, 2005 through August, 2006, Mr. Jimenez was always readily locatable in Colombia. He was living openly, publicly and under the control/supervision of the Colombian government.

36. Specifically, in that one year period, Mr. Jimenez attended periodic meetings with members of the Peace Commission to coordinate the demobilization of approximately ten AUC blocks. He attended many meetings with organizations representing the victims of

---

[20] the Control of Guarantees Magistrate

the armed conflict and with several human rights organizations. He went to many zones to convince other skeptical AUC commanders to demobilize their blocks.  He had many meetings with church leaders and peace process advisors to discuss important matters such as the reintegration of AUC troops to civilian life and to develop "proyectos productivos"[21], a project eradicating coca plants in certain areas and converting those lands to produce legitimate marketable products, such as fruit, vegetables, wood, rubber and palm oil. He had several meetings with members of the press. On one occasion, he travelled to Costa Rica to meet with Colombia's then ex-president, Oscar Arias, who had previously won the Nobel Peace Prize.  All of these meetings and activities were previously known to and approved by the high members of the Peace Commission who coordinated same with the Interior Minister and even President Uribe.

Most of these meetings took place in Villa de la Esperanza, a site approved by the Colombian government for such purposes, secured by the Colombian National Police. During this year, Mr. Jimenez had a security team consisting of six armed detectives from the Departamento Administrativo de Seguridad, the equivalent of our Federal Bureau of Investigation. Wherever Mr. Jimenez needed to go during this period these six guards were at his side. Many of the meetings Mr. Jimenez attended were monitored, videotaped and publicized live by the Colombian press. As such, Mr. Jimenez' name and face were frequently displayed in every Colombian household, over the television, on the radio, in newspapers and magazines. All of these events were well known to and monitored by the U.S. government and its drug law enforcement agencies.

---

[21] "productive projects"

### E. **President Uribe's Order (August 2006) – The Justice and Peace Law Becomes Operational**

37.  In August 2006, President Uribe directed that all of the demobilized AUC commanders and members go to a prison called "La Ceja", near Medellin.

38. Mr. Jimenez entered La Ceja prison under his full legal name, an event that was highly publicized all over Colombia and was well known to the U.S. government and its drug law enforcement agencies.

39. In December, 2006, Mr. Jimenez was transferred from La Ceja prison to the Itagui prison (near Medellin), where he continuously remained easily locatable under his full legal name. Thereafter, Mr. Jiminez was temporarily transferred to two other Colombian jails/prisons[22] and ultimately returned to the Itagui prison, again, where he was easily locatable under his full legal name.

40. The U.S. government and its drug law enforcement agencies were well aware that under the Justice and Peace Law, the participants were required to confess their crimes and provide documents.[23]

41.  Anxious to capitalize on this, the U.S. became directly involved with the mandatory confessional statements provision of the Justice and Peace Law. To be sure, *before* the confessional statements began in Colombia, one or more U.S. prosecutors went to Colombia to assist the Colombian Justice and Peace prosecutors in formulating questions to ask the U.S. drug targets during these Justice and Peace interrogatory sessions, obviously, to match U.S. drug indictments and/or U.S. drug law enforcement

---

[22] The Combita prison en Boyacá and the Bellavista jail in Medellin
[23] This provided U.S. drug law enforcement with an unusual and powerful strategic advantage. Where a person who has a pending indictment in the United States may make public inculpatory statements at his own risk, an individual who is not aware of any such charges may incriminate himself unknowingly. The United States was well aware of this fact and thus kept Mr. Jimenez' indictment sealed for two years and three months.

investigations. The U.S. prosecutor(s) even went to the Colombian Justice and Peace tribunals to monitor and witness the confessional statements live.

42. On September 25, 2007, Mr. Jimenez's indictment was superseded[24] unsealed and a provisional arrest warrant ("PAW") was issued for his arrest. Within days, the PAW was served on Mr. Jimenez at the Itagui prison. Within 60 days thereafter, a formal request for his extradition followed via routine diplomatic channels.

43. On or about May 7, 2008, President Uribe extradited fourteen ex- AUC commanders (including Mr. Jimenez) to the U.S. Mr. Jimenez arrived in Washington, D.C. that same day.

44. On May 8, 2008, Mr. Jimenez was arraigned and pled not guilty to the indictment.

45. In December, 2008, the U.S. government provided the defense with a disk of Rule 16 material, most of which came from Mr. Jimenez's Justice and Peace Law confessional statements and documents, obviously given to the U.S. government by the Colombian Justice and Peace prosecutor assigned to Mr. Jimenez.

46. Mr. Jimenez is currently incarcerated at the D.C. Jail.

## II. MEMORANDUM OF LAW

In *Barker v. Wingo*, 407 U.S. 514, 530 (1972), the Supreme Court enunciated a four part test for courts to determine whether a defendant's constitutional right to a speedy trial has been violated. The four part test is: (1) length of the delay; (2) reason for the delay; (3) the defendant's assertion of his/her speedy trial right; and (4) the prejudice to the defendant. If the time of the delay has "crossed the threshold dividing ordinary from presumptively prejudicial delay", an inquiry must be undertaken. *Doggett v. United States*, 505 U.S. 647, 651-652 (1992).

---

[24] As stated, the second indictment was not titled as a "superseding indictment." However, the document extended the date of the charged conspiracy of Count I and added a second count, alleging a violation of 21 USC §960(a)(3).

Delays exceeding one year are "*presumptively prejudicial.*" *Id.* at 652, n.1; *United States v. Ingram,* 446 F.3d 1332, 1336, 1337 (11th Cir. 2006)(two year delay triggered inquiry and dismissal of indictment); *United States v. Twitty*, 107 F.3d 1482, 1490 (11th Cir. 1997)(two year lapse was sufficient to trigger inquiry); *United States v. Clark*, 83 F.3d 1350, 1352 (11th Cir. 1996) ("Since delays exceeding one year are generally found to be "presumptively prejudicial," [Doggett] at 652, n1...., we conclude that the 17 month delay in this case is sufficient to entitle Clark to a presumption of prejudice").

If the first three *Barker* factors weigh heavily against the government, the defendant need not show the fourth factor, actual prejudice, because prejudice will be presumed. *Ingram*, 446 F.3d 1336 (citing *Doggett,* 505 U.S. 647);*United States v. Ospino*, 485 F.Supp.2d 1357, 1361 (S.D. Fla. 2007)(Judge Moreno dismissing indictment without any showing of actual, particularized prejudice where first three factors of inquiry weighed heavily against the government) (noting that he was bound by Supreme Court precedent to dismiss the indictment).

## 1. Length of Delay:

The defense contends that the U.S. investigation against Mr. Jimenez began in the late 1990s or early 2000s, when he was known under his nicknames "Javier Montañez" and "Macaco". We believe that in 2002, he was positively identified as Carlos Mario Jimenez-Naranjo. Thus, the *pre-indictment* delay was between one to five (5) years.

The *post-indictment* delay was well over two years, ***from June 2005 to September 2007.*** The pre-indictment delay compounds the post-indictment delay. As the court in *Ingram* concluded, post indictment delay weighs even more heavily against the government when there is, in addition, a significant pre-indictment delay.  In cases where the delay triggers the *Barker* inquiry, in analyzing how much to weigh the delay against the government, the length of pre-indictment delay should likewise be evaluated, *Ingram*, 446 F.3d at 1339 (citing *United States v.*

*Watson*, 599 F.3d 1149, 1157 (2nd Cir. 1979). In *Ingram*, the appellate court found that a delay of two and half years between the discovery of the offense and the indictment compounded the post-indictment delay and thus held that the post-indictment delay weighed more heavily than it might in other cases, *Id.*

In short, the pre-indictment delay here was at least one year to perhaps five years and the post-indictment delay was two years and three months. Thus, the pre-indictment delay required more weight to be placed on the post-indictment delay. A two year, three month post-indictment, pre-arrest delay causes this first *Barker* factor to weigh against the government.

## 2. Reason(s) for the Delay:

"Because the prosecutor and the court have an affirmative constitutional obligation to try the defendant in a timely manner…the burden is on the prosecution to explain the cause of the pre-trial delay", *Ingram*, 446 F.3d at 1337. "[D]ifferent weights should be assigned to different reasons" for delay. *Barker*, 407 U.S. at 531. Ultimately, to determine whether Mr. Jimenez' right to a speedy trial has been violated, the conduct of the government must be weighed against Mr. Jimenez' conduct. *United States v. Tchibassa*, 452 F.3d 918 (D.C. Cir. 2006) (citing *Dogget*, 505 U.S. at 651).

In *United States v. Ellerbe*, 372 F.3d 462 (D.C. Cir. 2004), the appellate court reviewed the district court's denial of Ellerbe's speedy trial motion to dismiss. The *Barker* factor which was the focus in *Ellerbe*, was, which party was responsible for delay. The appellate court held that most, if not all of the delay from Ellerbe's initial appearance to trial, was caused not only by Ellerbe *himself*, but by his *dilatory delay tactics*, noting that from May 8, 2001 through April, 2002, Ellerbe engaged in a pattern of firing his various attorneys four times, almost always on the eve of trial and even caused a competency hearing to be held, causing multiple postponements of his initial trial date. Mr. Jimenez has not changed his legal

counsel, he has not caused any trial continuance and the Court has not had to waste any time ordering any competency evaluation on him.

Whether the delay was the result of the government's bad faith or negligence, or whether the defendant contributed to the delay because he was a fugitive or somehow thwarted his prosecution, must be considered. When the government deliberately delays bringing forth its case, it is weighed heavily against the government. *Barker*, 407 U.S. at 531. Even in the absence of intentional delay, negligence and lack of diligence will *still* be held against the government, *Ingram*, 43 F.3d at 1339 (noting that there was much more that the government could have done to find the defendant and ruling that the district court erred in refusing to dismiss indictment).

The government must acknowledge that Mr. Jimenez was not responsible for any of the pre-indictment delay (between the commencement of the investigation and June 2005), or any of the post-indictment delay (between June 16, 2005 and September 25, 2007). There is absolutely no evidence that Mr. Jimenez attempted to avoid or evade prosecution in either period.

Indeed, the contrary applies. In 2003, the AUC peace process began. Mr. Jimenez openly participated as an AUC negotiator through and until mid 2005. He sat at the negotiation table every time a meeting was scheduled at Villa de la Esperanza. In 2004, he voluntarily registered into Santa Fe de Ralito. In April 2005, Mr. Jimenez secured U.S. legal counsel who opened communications with federal prosecutors in Washington D.C. *before* his indictment was even returned and sealed. In December 2005, he and his entire Bloque Central Bolivar, demobilized an event that was nationally publicized, live and by videotape and which made nationwide headlines. In August 2006, he entered La Ceja prison and remained imprisoned until he was extradited to the U.S. in May, 2008.

In short, from 2003 forward, Mr. Jimenez was always easily locatable under his full legal name and that never changed until his extradition was requested on September 25, 2007, when he

was an inmate in the Itagui prison. Therefore, this second *Barker* factor heavily and exclusively weighs against the government.

### The Delay was Deliberate

All indications are that the government here acted deliberately to delay this matter. Post-indictment, there was absolutely *no* reason to keep Mr. Jimenez' indictment under seal other than to gain a tactical advantage over Mr. Jimenez – the confessional statements and documents.

When the government filed its motion to seal the indictment (in June, 2005), it articulated its reason(s) for doing so. In its response to *this* motion, the government must justify not only the need to seal Mr. Jimenez' indictment in June 2005, *but why that need existed for two years and three months thereafter.*

As stated, the same U.S. Attorney's Office that indicted Mr. Jimenez under seal (in June, 2005), had indicted C. Castaño (in 2002)[25] with an indictment that, a few days later, was unsealed, published and sent to Colombia with a PAW. The reason C. Castaño's indictment did not remain under seal is obvious - in 2002, there was no peace process (or Justice and Peace Law) in Colombia.[26] In 2002, the government had no foreseeable chance to get confessional statements or documents from C. Castaño because back then, C. Castaño was still heavily involved in the armed conflict with the communist guerillas with no peace process or Justice and Peace Law even being conceptualized.

Contrarily, when Mr. Jimenez was indicted three years later, much had changed. In mid 2005, the U.S. government knew that by keeping *that* indictment under seal, it stood a good chance of getting incriminating statements and documents from Mr. Jimenez because of the "version libre" requirement of the then (new) Justice and Peace Law. The government needed to

---

[25] In short, the government cannot justify its delay by saying it did not believe the Colombians would extradite him.
[26] The peace process began *after* the Castaño indictment was publicized.

keep Mr. Jimenez's indictment a secret (underseal) until he finished his "version libre" statements in Colombia, so, if he ever got extradited to the U.S., he would never stand a chance at trial. Since the government was aware that Mr. Jimenez had U.S. legal counsel, it surely must have anticipated that had Mr. Jimenez's indictment been made public, he never would have made or delivered any incriminating statements or documents to his Colombian Justice and Peace Law prosecutor, at least without taking measures to avoid having them later used against him in his U.S. prosecution.

Because of the U.S. government's direct and heavy involvement with the Justice and Peace Law, there is even a flavor of a *Miranda* and *Massiah* violation against Mr. Jimenez because the Justice and Peace Law confessional statements, while voluntary, were custodial in nature. The government *knew* that Mr. Jimenez was represented by U.S. legal counsel (but was under a sealed indictment) at the time it was getting the confessional statements and documents from Mr. Jimenez, albeit via his Colombian Justice and Peace prosecutor.

Simply stated, the whole and sole purpose for the liaison activity between U.S. prosecutors and the Colombian Justice and Peace prosecutors, *from the U.S. government's perspective,* was to use that law to surreptitiously get confessions and incriminating documents to later use against AUC targets, under U.S. investigation or indictment, including, of course, Mr. Jimenez. The U.S. government thus *intentionally* kept Mr. Jimenez' 2005 indictment under seal until *after* he gave his confessional statements and submitted incriminating documents pursuant to his participation in the Justice and Peace Law Process in Colombia.

In December 2008, the government provided the defense with a disk containing Rule 16 material. This was the government's *first* Rule 16 discovery disclosure. Almost all of those materials contain the confessions/documents given by Mr. Jimenez to his Colombian Justice and Peace Law prosecutor in Colombia *after June 16, 2005*. The *only* reason those documents and

confessions *now* constitute Rule 16 material against Mr. Jimenez, is because *after* he presented

them to his *Colombian* justice and peace prosecutor, *that* prosecutor gave them to the United

States Attorney's Office in Washington, D.C..

The *only* reason for the government's deliberate choice in waiting so long to unseal its

indictment against Mr. Jimenez was to get an advantage over him at trial in the U.S., evidenced

by the contents of the government's recent Rule 16 discovery disclosure - to be able to use his

Justice and Peace Law confessional statements and incriminating documents against him, and, to

be able to supersede his indictment back in September, 2007, to include count II.[27]

As such, this second *Barker* factor also weighs heavily against the government.

### 3. Exercise of the Defendant's Speedy Trial Rights:

The third factor in the *Barker* test requires the defendant to assert his right to a speedy

trial, *Barker*, 407 U.S. at 530. The failure to do so makes it difficult for a defendant to prove that

a Sixth Amendment violation occurred, *Id.* at 532. This motion is timely filed and thus this third

*Barker* factor weighs against the government.

Mr. Jimenez first knew he was indicted in September, 2007. His first appearance in this

district was on May 7, 2008. He then waited *seven months*, until December 2008, to get his first

glimpse of *any* Rule 16 discovery. Because of *that* delay, occasioned by the government, Mr.

Jimenez had to seek several extensions of the deadlines to file his pretrial motions.[28] Thus, the

time that has passed from Mr. Jimenez' arraignment until the filing of *this* motion is attributable

*only* to the government. Mr. Jimenez cannot be faulted for agreeing to a January, 2010 trial date

---

[27] We believe that to prove this particular purpose the court may have to review the grand jury transcripts that relate to the superseding of the original indictment because we believe in good faith that most if not all of the evidence submitted to the grand jury which superseded the indictment was obtained from the confessions and documents Mr. Jimenez provided to his Colombian Justice and Peace prosecutor.

[28] The first hearing setting motion cut-off dates was on May 21, 2008. Mr. Jimenez sought two extensions of the deadline; one on June 16, 2008 [D.E. 15] and another on July 1, 2008 [D.E. 16]. He then filed his first round of non-discovery related pretrial motions on July 8, 2008, receiving additional time to file other motions that would be triggered by any discovery and two other specific motions.

and seeking an extension of two months of the deadline for filing his pretrial motions, when no discovery was given to him until December, 2008. In fact, much of the discovery still has not even been provided, ten months after Mr. Jimenez' initial appearance and four years after his indictment was returned.[29]

The Court in *Barker* held that a defendant's assertion of his speedy trial rights is "entitled to strong evidentiary weight", *Id.* at 531-2. A defendant's assertion of his speedy trial rights, however, must be viewed in light of the defendant's other conduct, *United States v. Loud Hawk*, 474 U.S. 302, 314 (1986). In *Loud Hawk*, the Court found that, at the same time the defendants were making speedy trial claims in the district court, they consumed six months by filing indisputably frivolous motions for rehearing and certiori and filled the district court's docket with repetitive and unsuccessful motions, *Id.* at 513.

Mr. Jimenez' motion practice has not been indisputably frivolous nor has it resulted in the very delay he is complaining about. The motions he filed had to meet court-imposed filing deadlines, or they would be waived. Those motions were not filed to delay the proceedings. They were filed to tailor certain trial issues in case the instant motion to dismiss is denied. Stated differently, Mr. Jimenez could not be placed in the position of filing no motions, expecting this speedy trial motion to be successful, because if this motion were denied, he would have waived all of his other defense motions – a strategy that would also render his legal counsel as ineffective. Mr. Jimenez has not yet even argued *any* of his filed motions, and of course, therefore, he has not sought any rehearing or certiorari on any of his filed motions. Indeed, the government does not oppose Mr. Jimenez' defense motions numbered 10 and 11, so there will be

---

[29] At the December, 2008 status conference, government counsel announced that he was still waiting to get about 40% of discovery "from *Colombia*". At the recent April 6, 2009 status conference, government counsel provided some additional discovery material to the defense. While this discovery has not yet been reviewed, it appears that the second round of materials, in significant part, also come from the Colombian Justice and Peace Law process. Therefore, it appears that even the remaining materials – if we ever get them – will also come from the Colombian Justice and Peace prosecutor.

no litigation on those two motions. There has been no evidence taken or argument made to this

Court on *any* of Mr. Jimenez' filed motions, nor has this Court adjudicated any such motion as of

yet.

      Instead, the government's sealed indictment of Mr. Jimenez allowed more than two

years to elapse without notifying him of the indictment to surreptitiously allow him to make

admissions and give incriminating documents to his Columbian Justice and Peace prosecutor,

knowing all along that they would find their way in the hands of U.S. prosecutors.  Following

that delay, Mr. Jimenez was ultimately extradited to the U.S.  This delay is compounded by the

government's additional delay in putting together its discovery, much of which the defense still

does not even have, now almost one year after Mr. Jimenez's initial appearance in this district

and four years after his indictment was returned. The government cannot explain how and why it

has taken four  years now to get the discovery out of Colombia supporting an indictment returned

over four years ago. There is no acceptable answer to this question and is the very reason why

this factor weighs against the government in all respects.

      Having lived openly under his real name in Colombia where his whereabouts were

known, from June 16, 2005 through September 25, 2007 and thereafter, Mr. Jimenez did not

contribute in any way to the delay in him being brought to the United States to answer the

charges lodged against him.

      Thus, this third *Barker* factor weighs against the government.

**4. Prejudice:**

## PRESUMED

      Given the length of the delay *alone* here, prejudice is presumed. Since the pre-indictment

delay (of one to five years) compounds the post indictment delay (two years and three months),

prejudice is presumed yet more readily.

Prejudice is also presumed where the first three *Barker* factors weigh heavily against the government. *Doggett*, 505 647. Since here, the first three *Barker* factors weigh heavily against the government, prejudice against Mr. Jimenez is presumed on that alternative basis.

As another alternative, where the delay is excessive and the government's reasons for delay are weak, the presumption of prejudice shall suffice and the defendant need not demonstrate actual prejudice, *Ingram, 446 F.3d 1330*. As the court explained, the "rationale for presuming prejudice is, after all, that 'excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove, or, for that matter, identify.'" *Id.*

Here, a two year and three month post-indictment delay was excessive and the government's reason for the delay is extremely weak[30]. Thus, under this *alternative analysis method,* actual prejudice need not be shown.

## ACTUAL

Courts have previously acknowledged that actual prejudice is difficult to prove. *See, e.g., Doggett*, 505 U.S. at 655 ("*Barker* explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time erosion of exculpatory testimony and evidence 'can rarely be shown'"). Nevertheless, we can demonstrate, if necessary, some actual prejudice visited on Mr. Jimenez.

In *U.S. v. Tchibassa*, 452 F.3d 918 (D.C. Cir. 2006), the appellate court reviewed the decision of the district court denying Tchibassa's speedy trial motion. There, the defendant was charged with participating in a 1990 hostage-taking for ransom of a U.S. citizen in Angola which took place on October 18, 1990. Tchibassa was indicted less than a year later, on September 25, 1991, under seal.

---

[30] To gain the tactical advantage on Mr. Jimenez we have discussed herein.

In 1994, Tchibassa learned that Interpol wanted to talk to him so he went to Brazzaville, Congo and spoke with Interpol representatives where he was told that American authorities wanted to arrest him. He went to the U.S. Embassy in Kinshasa, Zaire in 1994 more than five times for diplomatic activities (and several times thereafter, until 1998).

In 1996, the U.S. State Department learned of the visits made by Tchibassa up until that time, and called the Congolese government to make his provisional arrest for purposes of extraditing him to the United States.

On July 11, 2002, the FBI arrested Tchibassa in the office of the DROC intelligence Bureau. He was arraigned four days later in Puerto Rico. Ten months later, Tchibassa filed a motion to dismiss the indictment, asserting his Sixth Amendment right to a speedy trial.

The parties stipulated that the length of delay between indictment and arrest - some eleven years – was long enough to be considered presumptively prejudicial. The court expressed concern that there was no apparent government effort to apprehend Tchibassa from the time he was indicted on September 25, 1991 until Interpol issued the "Red Notices" some time in 1993. *Id.* at 924. The appellate court specifically said, "... this gap of more than two years casts some doubt on the government's diligence and might, under other circumstances, tip the balance against it". *Id.* The district court denied the speedy trial motion and Tchibassa went to trial on September 4, 2003 and was convicted. The appellate court, adopting the district court finding, found that Tchibassa was more to blame than the government for the initial delay because he maintained his residence in Zaire *beyond the government's diplomatic reach.*

Here, however, Mr. Jimenez was not beyond the U.S. government's diplomatic reach during the post -indictment, pre-arrest period. From June 16, 2005 through and including September 25, 2007, Mr. Jimenez' whereabouts in Colombia were well known, well documented and well controlled; in that period, the U.S. maintained diplomatic relations with Colombia; in

that period, there was an existing extradition law between Colombia and the U.S.; and, by 2005, President Uribe had already extradited not one, but several hundreds of Colombian citizens to the U.S. upon request.

In *Tchibassa*, the appellate court found that although the government might have been able to undertake more frequent and extensive efforts to secure Tchibassa's arrest, "… it is not clear that any such effort would have succeeded so long as Tchibassa voluntarily remained beyond the United States'" legal or practical reach". *Id.*

Our case is different.  Although Mr. Jimenez was in Colombia when he was indicted, he was not beyond the U.S.' "legal or practical reach". He was living publicly and openly.  He sat at scheduled peace process negotiations/meetings in Villa de la Esperanza from 2003 to 2005.  He was demobilized and registered in 2005 and lived under a government provided security force until August, 2006 when he went to La Ceja prison. Thus, from June, 2005 forward, all the U.S. had to do was serve him with a PAW and follow it up sixty (60) days later with a formal extradition request through the Office of International Affairs. In *Tchibassa*, the appellate court noted that the district court did not err in finding that the government had *no* opportunity to arrest Mr. Tchibassa and get him extradited to the U.S. Such a finding could *never* be made with regards to Mr. Jimenez.

Regarding the " speedy trial invocation" factor in *Tchibassa*, the appellate court found that Tchibassa knew of his criminal charges in 1994, but waited to file a motion to dismiss until nine years later, in 2003. Mr. Jimenez did not know of his charges until September 25, 2007; he could not move to dismiss his charges before then. Further, it did not take Mr. Jimenez nine years to file his motion; it took him nine months – only three months after he received (the first partial) discovery in the case, which took two months to review.

Regarding the "prejudice" factor, the appellate court noted that "Tchibassa alleges only generally that the passage of time compromised his 'ability to locate witnesses in West Africa who could confirm Tchibassa's role in FLEC and the Swan negotiations in 1991'...without identifying any material witness much less a failed attempt to locate one." *Id.* at 927. More specifically, the appellate court held that Tchibassa's brief was absent of "specific, articulable prejudice". Mr. Jimenez, however, can cite to *specific, articulable prejudice Id.* he has suffered from the delay in his case.

The *Ingram* case also provides guidance and is persuasive authority on the dismissability of an indictment on post-indictment, pre-arrest grounds. In *Ingram*, like here, after learning of the offense, the government took over two  years to indict the defendant.  The agent responsible for arresting Ingram did little to look for him and thus he was not brought to court for *another* two years after the agent finally contacted him and he surrendered, *Id.* at 1337 -39. Just like Mr. Jimenez, Ingram lived openly, *Id.* at 1338-39.  Like Mr. Jimenez, Ingram did nothing to contribute to the delay and timely filed his pre-trial motion to dismiss the indictment after his initial appearance. Ingram's speedy trial motion was denied by the district court. On appeal, however, the Eleventh Circuit reversed, holding that the indictment must be dismissed because the unexcused delay violated Ingram's Sixth Amendment right to a speedy trial. The appellate court further held that Ingram need not show actual prejudice, *Id.* at 1339-40.

The delay in bringing the case forward against Mr. Jimenez is *more* egregious than that in *Ingram* and it likewise should result in a finding of presumed prejudice and dismissal. At least the agent in *Ingram* made *some* attempt to look for and arrest Ingram (by calling him at work and making other feeble efforts to locate him), which the appellate court still noted was insufficient and that the agent was dilatory, *Id.* at1338-1339.

Here, by contrast, the U.S. government chose to do *absolutely nothing* for two years and three months after Mr. Jimenez' original indictment was returned when it easily could have served him with a PAW at his known location in Colombia and then asked for his extradition immediately thereafter.

The following are specific, articulable instances of actual prejudice visited upon Mr. Jimenez:

1. Most of the Rule 16 evidence against Mr. Jimenez would not exist *but for* the delay.

2. The government would not have been able to supersede the indictment *but for* the delay.

3. The superseding indictment, if it results in a guilty plea or a guilty verdict, means that Mr. Jimenez will be ineligible for the benefits of the Justice and Peace Law. [31]

4. There are several documents and witnesses no longer available to Mr. Jimenez which has handicapped his ability to adequately defend the charges. In order to preserve the confidentiality of Mr. Jimenez' defense, he asks the Court for leave to submit a separate memorandum, *ex parte* and under seal, identifying witnesses and documents no longer available and a proffer of how such evidence would have promoted Mr. Jimenez' theory of defense and how he is crippled without it.

5. Most of the witnesses and much of the evidence in this matter are in Colombia as specifically evidenced by the government's Rule 16 disclosure to the defense. That makes investigating and finding witnesses expensive and time consuming, especially

---

[31] Since the indictment charges criminal activity *after* the Justice and Peace Law was passed, a finding of guilt will likely make Mr. Jimenez ineligible for the benefits of the Justice and Peace Law subjecting him to a forty (40) year term of imprisonment upon his deportation to Colombia.

when considering that twelve years have elapsed since the activities accused in the indictment took place.[32]

## III. CONCLUSION:

The government's substantial pre-indictment and substantial post-indictment delay, its inability to present an adequate reason for the delay, and, that reason being solely to gain a tactical advantage over Mr. Jimenez, the fact that he did not contribute in any way to the pre-indictment or post-indictment delay, Mr. Jimenez' timely assertion of his speedy trial right, the actual prejudice he has shown and the prejudice that should be presumed considering the length of the delay and the outcome of the other three factors, all support a conclusion that Mr. Jimenez' speedy trial right has been violated.

For the above stated reasons, the defendant, CARLOS MARIO JIMENEZ-NARANJO, respectfully requests that the Court dismiss all charges against him.

## IV. REQUEST FOR HEARING:

The defendant, CARLOS MARIO JIMENEZ-NARANJO, respectfully requests that the Court hold a hearing on this matter.

Respectfully submitted,

s/ Richard Diaz

_____

Richard J. Diaz, Esquire
F.B.N. 0767697
RICHARD J. DIAZ, PA
Attorney for Carlos Mario Jimenez
3127 Ponce de Leon Blvd.
Coral Gables, FL 33134
Telephone: (305) 444-7181
Facsimile: (305) 444-8178
E-mail: rick@rjdpa.com

---

[32] The indictment accuses criminal conduct dating back to 1997.

26

s/ Donna R. Newman

_____

Donna R. Newman, Esquire
N.Y.B.N. 2367126
BUTTERMORE, NEWMAN, DELANNEY,
& FOLTZ, LLP
Attorney for Carlos Mario Jimenez
111 Broadway
Suite 1805
New York, NY 10006
Telephone: (212) 229-1516
Facsimile: (212) 676-7497
E-mail: donnanewmanlaw@aol.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that a true and correct copy of the foregoing was electronically

filed using CM/ECF this 17th  day of April, 2009 and is being served to all counsel of record via

transmission of notices of electronic filing generated by CM/ECF.

s/ Richard J. Diaz

_____

RICHARD J. DIAZ, ESQ.

27